J-A03036-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| E.M., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| D.Z., MOTHER | |
| Appellee | No. 2086 EDA 2015 |

Appeal from the Order Entered June 8, 2015
In the Court of Common Pleas of Bucks County
Civil Division at No(s): 2013-61073

BEFORE:  GANTMAN, P.J., MUNDY, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED MARCH 10, 2016**

Appellant, E.M. ("Father") appeals from the order entered in the Bucks County Court of Common Pleas, which granted primary physical custody of the parties' minor child, J.Z. ("Child"), to Appellee, D.Z. ("Mother") subject to periods of partial custody by Appellant.  We affirm in part but vacate and remand for clarification of the order.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION OR COMMITTED AN ERROR OF LAW WHEN IT AWARDED [MOTHER], PRIMARY PHYSICAL CUSTODY BASED UPON UNREASONABLE CONCLUSIONS IN LIGHT OF THE TRIAL COURT'S SUSTAINABLE FINDINGS OF FACT?

THE [TRIAL] COURT'S AWARD OF PRIMARY CUSTODY TO [MOTHER] WAS NOT SUPPORTED BY THE EVIDENCE PRESENTED UNDER THE CUSTODY FACTORS ENUMERATED IN 23 PA.C.S. § 5328(A), THE MAJORITY OF WHICH WEIGHTED IN FAVOR OF [FATHER], AND WAS THUS UNREASONABLE IN LIGHT OF THE [TRIAL] COURT'S SUSTAINABLE FINDINGS OF FACT.

WHETHER THE [TRIAL] COURT'S ORDER AWARDING PRIMARY PHYSICAL CUSTODY TO [MOTHER] WAS UNREASONABLE IN LIGHT OF THE EVIDENCE PRESENTED ON THE RECORD AND THE CIRCUMSTANCES OF THIS CASE BECAUSE, WHEN CONSIDERING THE BEST INTERESTS OF THE CHILD, THE [TRIAL] COURT FAILED TO GIVE APPROPRIATE WEIGHT TO [MOTHER]'S ONGOING ATTEMPTS TO DEPRIVE THE MINOR CHILD OF FATHER'S CARE AND AFFECTION, WHICH IS PROBLEMATIC IN LIGHT OF THE [TRIAL] COURT'S SIMULTANEOUS CONCLUSION THAT [MOTHER] LIED TO AUTHORITIES AND MEDICAL PROVIDERS ABOUT FATHER, AND HAS NOT AND WILL NOT FURTHER THE CHILD'S RELATIONSHIP WITH FATHER?

WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN AWARDING [MOTHER] PRIMARY PHYSICAL CUSTODY OF THE PARTIES' MINOR CHILD, WHEN SUCH AWARD WAS AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL, AND IS CONTRARY TO THE BEST INTEREST OF THE CHILD?

WHETHER THE [TRIAL] COURT ERRED WHEN IT FAILED TO MAKE A FINDING OF SHARED LEGAL CUSTODY BASED UPON ITS SUSTAINABLE FINDINGS AND THE EVIDENCE PRESENTED?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION OR COMMITTED AN ERROR OF LAW IN FINDING THAT IT WAS NOT IN THE BEST INTEREST OF THE MINOR CHILD TO CHANGE THE CHILD'S NAME TO INCLUDE FATHER'S SURNAME, IN LIGHT OF THE COURT'S SUSTAINABLE FINDINGS?

(Father's Brief at 4-5).

Our scope and standard of review of a custody order are as follows:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

> \* \* \*

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014) (quoting *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009)).

With respect to a custody order, Section 5328(a) provides:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and

- 3 -

permit frequent and continuing contact between the child and another party.

(2)     The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3)     The parental duties performed by each party on behalf of the child.

(4)     The need for stability and continuity in the child's education, family life and community life.

(5)     The availability of extended family.

(6)     The child's sibling relationships.

(7)     The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)     The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)     Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)  Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)  The proximity of the residences of the parties.

(12)  Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013). A court's explanation of the reasons for its decision, which adequately addresses the relevant custody factors, complies with Section 5323(d). *Id.*

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Alan M. Rubenstein, we conclude Father's issues for the most part merit no relief. The trial court comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed August 21, 2015, at 16-23) (examining each relevant factor under applicable statutes; custody and name-change decisions are in Child's best interests). Nevertheless, we observe that the custody order does not fully reflect the court's custody

decision, as its opinion relates, with regard to legal custody and federal holidays. Further, the order makes no mention of Mother's Day and Father's Day to be awarded to the respective parent. Therefore, the best resolution of this case is to affirm the custody decision on the basis of the trial court's opinion but to vacate and remand the matter to the trial court to clarify its custody order and revise it accordingly.

Order vacated; case remanded for clarification. Jurisdiction is relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/10/2016

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## FAMILY DIVISION

E.M                             :        NO. 2013-61073-C
                                :
            vs.                 :        CUSTODY
                                :
D. Z.                           :        CHILDREN'S FAST TRACK
                                :        APPEAL

### OPINION

Case #: 2013-61073 C B09    10963379

Code: 5076       Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt: Z1361323  8/21/2015 12:02:03 PM

E.M. ("Father") has appealed from this Court's Order of June 8, 2015 awarding primary physical custody of the parties' minor child, ("J.Z.") (D.O.B. , 2013), to D. Z. ("Mother), and awarding partial custody of J.Z. to Father on the first, third and fifth weekends as they occur from Friday at 6 p.m. until Sunday at 6 p.m.

Our Order also provides that Father shall have custody of J.Z. on the federal holidays of Presidents Day, Columbus Day and Veterans Day, and he shall have custody of J.Z. on Independence Day, Labor Day, Halloween Eve, Thanksgiving Day and Christmas Day in odd-numbered years. Our order also directs that each party shall, with 30 days' notice to the other party, have two (2) nonconsecutive weeks of vacation.

Because this appeal has been designated as a "Children's Fast Track Appeal," this Court is required pursuant to Pa. R.A.P. 1925(a)(2)(ii) to expedite an Opinion specifying the reasons for our Order. The Notes of Testimony for the eight (8) hearings have not yet been transcribed. Therefore, we have relied upon our contemporaneous notes and recollection of the testimony.

We have filed a written Order reflecting our findings and conclusions, and we have attached a transcribed copy of that portion of the Notes of Testimony (45 pages). We have also attached a copy of our written Order of June 8, 2015.

Litigation in this matter was commenced when Father filed two (2) "Emergency Petitions for Custody" in the Montgomery County Court of Common Pleas on or about April 23, 2013 and May 3, 2013. Thereafter, on June 11, 2013, the parties entered into a Temporary/Interim Agreed Custody Order in Montgomery County which provided for DNA testing, shared joint legal custody, and for Mother to have primary physical custody and Father to have "phased in" partial custody. Because Father resides at ' . Jenkintown, Pennsylvania, but Mother resides with the child at Sellersville, Bucks County, Pennsylvania, the Order included an agreement to transfer this matter to the Bucks County Court of Common Pleas.

The case came before this Court after Father filed a "Petition to Modify Custody and for Contempt of Custody" on August 12, 2013 in the Bucks County Court of Common Pleas. In his Petition, Father alleged that Mother was in contempt of the shared legal custody provisions of the June 11, 2013 Montgomery County Order by removing the child from the Commonwealth and making important medical decisions for the child without consulting Father. Father also alleged that Mother refused to provide necessary documents, e.g., Social Security card, for the child. In his Petition to Modify Custody, Father requested shared physical custody of the child.

One month later, on September 12, 2013, Mother filed a "Petition for Counsel Fees for Litigation which is Arbitrary, Obdurate, Vexatious and/or in Bad Faith," and then on September 24, 2013, Mother filed an Emergency Petition to Modify Custody. In her Emergency Petition, Mother alleged that although she was breastfeeding the infant child, Father was either improperly or completely failing to feed the infant when the child was in his partial custody.

Eight (8) days of hearings were subsequently conducted over a twenty (20) month period: November 6, 2013, February 12, 2014, April 3, 2014, June 5, 2014, October 1, 2014, December 31, 2014, March 27, 2015, and on June 8, 2015, after which this Court issued the present Custody Order from which Father now appeals.

2

On the first day of the hearings on November 6, 2013, arrangements were made for four sign-language interpreters to be present in the courtroom as both parties are hearing-impaired. The sign language interpreters for both parties attended all eight (8) hearings.

Jennifer Z. of Conshohocken, Pennsylvania, testified that she was a friend of Father through her husband, Christopher Z. She initially met Mother at a social gathering at her apartment on July 22, 2012. Mother confided to Ms. Z. that she was "in love" with Father, but troubled by the fact that he had been previously married and had "loved someone else." Ms. Z. stated that Mother wanted Father to "buy her a ring," "marry her" and "buy a house" so she would no longer have to live with her parents. When a pregnancy test later confirmed that Mother was pregnant, Ms. Z. testified that Mother was no longer friendly toward her.

Christopher Z. who is also hearing-impaired, lives with his wife Jennifer. He testified that he met Father first and then met Mother. He stated that Mother and Father were in a "relationship," and that Mother was anxious to move into a house with Father because she did not want to live with her parents who she claimed were "abusive" toward her. Mr. Z. testified that he had videotaped Father feeding J.Z. two or three times, and that the baby "took a bottle" from Father. After the birth of J.Z., he stated that Father texted Mother and visited her home on multiple occasions for the sole purpose of visiting the child, and not for the purpose of harassing Mother as she claimed.

Mr. Z. testified that Father informed him that after Mother and Father ended their relationship prior to the birth of the baby, Mother had no contact with Father. He also noted that although Father had wanted to participate in the birth of the child, Mother did not permit his participation, and Father did not see the child until the child was at least five to six weeks old, and only after he had obtained the Emergency Court Order in Montgomery County on June 11, 2013. He also testified that Mother informed Father that he was not the biological father of the child.

3

At the next scheduled hearing on February 12, 2014, this Court initially held "Father's Petition for Name Change of Minor Infant," filed on the same day, in abeyance pending further proceedings.

Father testified that he lives in Jenkintown, Pennsylvania and is employed by the U.S. Navy Yard in Northeast Philadelphia. He met Mother at the end of 2012, and after one month they became involved in an "intimate" relationship. Mother told Father that she was using "birth control." Mother and Father subsequently began residing together in Hatboro, Pennsylvania. Mother then called Father at work one day and asked him to "come home." Upon his arrival home, Mother handed him a card, stating "Congratulations to the Father-to-be," with a baby pacifier attached to the card.

Father testified he began to look at real estate and apartments, but he and Mother agreed that they could not afford either at that time. Mother told Father that she did [not] want them to live with her parents because her parents and her brother were physically and emotionally abusive to her.

Father testified that prior to the child's birth, he purchased a crib, clothes, a car seat and toys, and attended pre-natal physician's appointments with Mother. He said that after their relationship ended, Mother mentioned to Father that she considered having an abortion.

The child was born on April ., 2013. Father testified that he learned of the child's birth via "social media' when he saw a picture of his son on Facebook. Father said he went with his stepmother to visit his son at Mother's home on April 28, 2013, but was told by Mother's father, ` W. Z. ., that Mother did not want him to visit with his son. In June, 2013, Father said Mother informed him that he was not the biological father of the child and she wanted him to undergo a paternity test.

Father testified that a Temporary Custody Order was entered by the Montgomery County Court of Common Pleas on June 11, 2013, and the case was thereafter transferred

4

to Bucks County. Father said he underwent the paternity test and later saw his son for the first time on June 17, 2013, when the child was two (2) months old.

Father testified that he works four ten-hour days a week and wanted to see his son on the weekends, but Mother had refused all previous requests for weekend visitation. Father eventually had his first weekend visit with J.Z. for only one-and-half hours, on July 2, 2013, at the Montgomeryville Mall. Mother and Father's mother were present during that visit.

Father testified that Mother did not inform him about any of J.Z.'s doctor's appointments. He said that although Mother had accused him of causing J.Z.'s "diaper rash," Father did not have custody of J.Z. when the rash occurred. He said that on September 9, 2013, Mother accused Father of not feeding J.Z. during a four-and-a-half hour weekend visit with the child, which she claimed resulted in the child's "dehydration." The physician's notes that were admitted as Exhibit F-8, however, did not confirm this complaint, and indicated that it was not supported by any medical evidence. Father also testified that Mother refused to provide him with J.Z.'s Social Security number, denied his request for a holiday and special events schedule, and would not advise him of J.Z.'s medical appointments.

In addition, the Discharge Summary from Abington Hospital that was issued after J.Z.'s birth stated that Mother claimed that her "boyfriend [Father] was physically abusive" and that hospital security had been notified. This, according to Father, was untrue. Father also stated that Mother had refused permission for Father to have any overnight visitation with J.Z.

According to Father, he has only had custody of J.Z. "2.54% of the time."

Father stated that Mother had told him that she had been physically abused by her brother, ⁻ and she admitted to Father that her brother was an alcoholic. Father said that Mother currently resides in the same house with brother who "yells," "threatens" and

5

"assaults" her. Father testified that brother is violent, "kicks doors and kicks walls," and has been intoxicated on many prior occasions.

Father testified that Mother has called Father "stupid," "retarded" and "ugly" in the presence of their son, and he is concerned that Mother's behavior will "poison" the child's mind against him.

Father testified that through his employment with the U.S. Navy, he has full-time daycare available that is provided on site. He also stated that if he is granted visitation or custody, he would seek time off pursuant to the Family Medical Leave Act.

After considering Father's demonstrated ability to care for his son and the fact that the acrimonious relationship existing between the parties was impeding Father's partial custody of J.Z., this Court issued a Temporary Custody Order at the end of this second day of testimony on February 12, 2014, in which we awarded Father partial custody of J.Z. on Saturday and Sunday from 10:00 a.m. to 7:00 p.m. We also directed that Mother provide a copy of the child's Social Security card to Father.

At the hearing of April 3, 2014, Father stated that Mother had told him on July 1, 2013 that "this is my baby and I'll do what I want," and she threatened to tell this Court that he was physically abusive and mentally ill. Father stated that he did not receive a legible copy of the child's Social Security card pursuant to the Temporary Custody Order, but subsequently received a legible copy on March 14, 2014, two (2) months after our Temporary Order was entered.

Upon consideration of Father's "Petition for a Name Change," Father testified that he requested a name change for J.Z. because of his concern that Mother would "poison the child's mind" by telling the child that he didn't have to listen to his father because "you have my last name."

6

Photographs were then introduced of Father's six-bedroom house where he lives with his stepmother. These photographs clearly showed that many items were piled on the porch of this home.

Father alleged that Mother was a "racist," and he again testified that she claimed she had been abused by her brother and emotionally abused by her mother. According to Father, Mother had requested that he take a paternity test for the only purpose of delaying his ultimate custody time with the child.

Father testified that he had suggested to Mother that she should pay rent to her parents in order to gain increased benefits for the child, such as Supplemental Social Security benefits.

Father related that in February of 2014, Mother reported to him that the child had a fever, and sent him a text photo of a thermometer which had a reading of 100.5 degrees. Mother then apparently refused to allow Father visitation with J.Z. because the child was allegedly sleeping.

At the next hearing of June 5, 2014, Father testified that in October or November of 2013, J.Z. began eating "solid foods" and was no longer breastfeeding. He testified that Mother has called the police five (5) times since the child was born. He related that after Mother informed him that she had taken the child to the Emergency Room at Grandview Hospital, his request to obtain copies of his son's medical records was denied by the hospital because Mother had not listed him as the "Father" on the hospital's medical records for J.Z.

Father related that Mother had sent him an email informing him that she was going to visit her family in Cape May, New Jersey with the child, and that they would be staying in her family's "trailer." Father complained that he would not see his son and he expressed concerns about the health and safety conditions in and around the trailer. Father also alleged that Mother's home was unsafe, and complained of various hazardous conditions, such as

7

the lack of sturdy baby gates and safety latches on doors, and the presence of "loose pallets" outside the home and a "combustion stove" that had no chimney.

Father testified that he had requested custody of J.Z. in order to bring him to his family's reunion in New York State, but Mother denied his request, however, when Mother requested a "switch" in custodial time so that she could spend Mother's Day with the child, Father also refused her request.

On cross-examination of Father concerning the rash that J.Z. had on May 17, 2014, Father testified that J.Z. had an allergic reaction to Amoxicillin and he therefore treated the rash with hydrocortisone cream. Mother, however, expressed concern that hydrocortisone was not recommended for use on children under the age of two. Testimony then concluded for the day and the hearing was continued.

Prior to the next scheduled hearing date, Father filed an Emergency Petition for Interim Primary Custody on September 15, 2014, alleging that while in Mother's custody, J.Z. had "suffered a severe head injury resulting in stitches and a permanent scar to his forehead." This Petition alleged several previous head injuries as well as unsafe conditions in Mother's home, and noted that this filing was motivated by this Court's cautionary instructions issued after the June 5, 2014 hearing, when we reinstated Father's overnight visitation and warned that any injury that occurs to the child because of existing hazards in either home would be an important factor in our ultimate decision.

On September 25, 2014, Mother filed her response to Father's Petition, denying all of his substantive allegations.

At the continuation of this hearing on October 1, 2014, Father presented a note from the pediatrician that indicated it was permissible to treat J.Z.'s rash with hydrocortisone. It was noted that an argument had occurred between Mother and Father at the pediatrician's office because Mother did not want Father to remain in the doctor's office during J.Z.'s examination.

8

Testimony was then presented concerning Father's Emergency Petition for Interim Primary Custody. According to Father, he filed the Petition because of the occurrence of multiple head injuries to the child while in Mother's custody. Father stated that Mother told him that J.Z. had been running and hit his head against a wall on June 17, 2014. Father stated that J.Z. experienced another head injury on September 4, 2014. Mother explained that J.Z. had been "looking at frogs" and fell, bruising his head, but appeared to be in no distress after that accident. Father insisted on taking the child to the Abington Hospital Emergency Room. It was subsequently determined that the child had a "superficial abrasion" and did not suffer a concussion.

Father also questioned whether Mother and J.Z. had been in an automobile accident because he observed "dents" in Mother's car. It was determined that there had been no automobile accident.

After the end of testimony at this hearing, Mother requested that she be permitted to take J.Z. to her sister's wedding in Wildwood, New Jersey, from Friday, October 3, 2014 to Monday, October 6, 2014. Her sister is J.Z.'s godmother. Father objected to this request unless he received "make-up time" for the loss of "his weekend." As a result, this Court issued an order granting Mother's request to take J.Z. to the wedding in New Jersey but granting Father three days of "make-up" custody time.

On December 31, 2014. M. M. who is Father's father and J.Z's paternal grandfather, testified that he lives with his ex-wife, D. W. , and his adult step and foster children in Hatboro, Pennsylvania. M. M. testified that in the summer of 2012, Mother had been living with them because she did not "get along" with her own family and did not like them. Mother told M. M. that she had been sexually abused by a relative.

9

According to M.M. ., Mother was "ecstatic" about her pregnancy, and in 2012, when Mother accompanied Father to a wedding for one of Father's relatives in Rhode Island, she showed photographs of her "ultrasound" to the wedding guests.

M.M. testified that his son had confided to him that he wanted to end his relationship with Mother and that they eventually broke up after the funeral of Father's stepbrother, __ who had committed suicide. After their relationship ended, M.M. stated that Mother did not inform Father of any of her obstetrician's appointments, and that Mother had contacted l M.M.'s ex-wife, D.W. ., to request that she be present with her at the time of delivery.

According to M.M. , Father only saw J.Z. during restricted visits that were usually 1 ½ to 2 hours in duration at the Montgomeryville Mall. He said that Father fed the baby at the Food Court, and that Mother would "yell and scream" and the child would "wince." M.M. testified that Father only saw J.Z. for two to three hours at Christmas time in 2013, and that Mother controls the visitation schedule.

Mother testified that she was using birth control when she met Father, and that she had engaged in sexual relations with two other men at or near the time she was having sexual relations with Father. She testified that she and Father "broke up" in November of 2012 when Father sent her a "text message." She admitted informing Father that the baby may not be his and that Father was angry and enraged at this revelation. She admitted that when Father sent a text message concerning the pregnancy, she called the police to report that he was harassing her.

Mother admitted that she would not allow Father to see the baby after he was born until the Montgomery County Court Order of June 11, 2013 was issued. She stated that she had prevented Father from seeing the child because she wanted a paternity test, yet she nevertheless filed for child support from Father. Mother stated that Father's first visit with J.Z. occurred on June 23, 2013, and the first visit Father had with J.Z. alone occurred on

10

July 29, 2013. She stated that all of Father's visits with J.Z., prior to September 2013, occurred at the Montgomeryville Mall and lasted for approximately 1 ½ hours.

Mother acknowledged telling the pediatrician that J.Z. developed a rash while at Father's home but that Father did not have J.Z. at his house until after the rash had occurred.

Mother admitted calling the police on September 9, 2013, when Father had custody of J.Z. for 4 hours, and alleging that the child was "dehydrated." She also admitted that she denied Father's scheduled visitation with J.Z. on January 7, 2014 because the "weather was cold."

On March 24, 2015, Father filed a "Petition for Contempt of Custody Orders," alleging that Mother had on several occasions prevented Father's visitation with J.Z. in defiance of this Court's Interim Custody Orders of February 12 and April 3, 2014.

On March 27, 2015 Mother testified that on March 6, 2015, J.Z. had been running and "bumped his head" and she took him to the hospital. She also acknowledged that a second head injury occurred on March 13, 2015, and that J.Z. was taken to Grandview Hospital where he spent 2 ½ hours in the Emergency Room.

Mother admitted that she made an appointment with an audiologist for an "early intervention assessment" at the Penn Foundation without notifying Father. She stated that she told the doctors that J.Z. was not verbal and "not speaking words." After an evaluation and assessment, however, it was determined that J.Z. was meeting all of his milestones and had "no developmental delays," and therefore further treatment was not recommended.

Mother testified that she disputed Father's allegation that J.Z. had had "69 doctor's visits" between April 27, 2013 and March 20, 2015. She stated that many of those 69 visits were not actual office visits but were only telephone calls to the doctor's office, and this was confirmed by a review of J.Z.'s medical records.

11

In response to Father's allegations in his Petition for Contempt, Mother agreed that she had retained custody of J.Z. all day on Sunday, November 30, 2014, and did not drop him off at Father's home, but she stated that she had an agreement with Father to modify the Sunday visit and had agreed to provide "make-up time" for Father.

Mother testified correctly that none of the Interim Custody orders that were entered contained provisions for "make-up time" and there was no set holiday schedule. As a result, neither Mother nor Father were required to provide "make-up time." Mother also acknowledged that she had refused to deliver J.Z. to Father for his partial custody visitation on one day because of a heavy snowstorm. We noted parenthetically that Father responded that "the roads are not that bad."

Mother then stated that as of today, in contrast to her previous behavior and conduct towards Father, she would like to compromise, cooperate, and work together to co-parent with Father.

This Court denied Father's Petition for Contempt, and the hearing was continued.

On December 31, 2014, Mother testified under cross-examination that she attends classes for 3 hours a day at DeSales University and expects to graduate in June 2015 with a degree in psychology. She wants to pursue a Master's Degree and assist the hearing-impaired community. At a later hearing she produced her diploma from DeSales University reflecting that she had earned her Bachelor's Degree.

Mother testified that when she learned she was pregnant, she took birthing, infant message and breastfeeding classes. She said she "believed" Father was J.Z.'s biological father until the ultrasound indicated that the fetus was "larger" than expected during her first obstetrician's visit. As a result, Mother said she was not sure Father was the actual father. When she told him he may not be the father, she said he was upset and angry.

12

Mother said they discussed living together, but told Father she did not want to live in his house in Jenkintown because there were three dogs present, one of which was incontinent, the house smelled, and Father' stepfather, who was an alleged drug user, was also living there.

Mother testified that she was "high risk" pregnancy because there was a family history of miscarriages. She testified that she had filed a Petition to Establish Paternity on June 11, 2013, but then withdrew this Petition. She then stated that once Father was declared to be J.Z.'s father, she contacted him to see J.Z.

On June 8, 2015, we addressed Mother's Motion for a Protective Order to quash the subpoena to Abington Hospital Father had filed to obtain all of the medical files, including all test results and mental health records for Mother. Father argued that Mother's medical records would show that Mother had lied about her due date and assertions that Father was not the biological father of J.Z. After determining that the requested subpoena was overbroad and sought material that was not relevant, this Court granted Mother's Motion for a Protective Order and quashed the subpoena.

Mother then testified that she had selected Highpoint Pediatric Dentistry in Chalfont for J.Z. and notified Father of her decision via e-mail. She stated that 2 or 3 weeks later, Father responded by suggesting a dentist located in Warrington because it was "equidistant" from their homes. Mother replied that Highpoint had multiple dentists and 24 hour emergency care, whereas Warrington only had one dentist. Mother also testified that Father does not attend J.Z.'s "sick visits."

This Court also observed that in one exhibit introduced at the hearing, Father stated in a text message to Mother that "[J.Z.'s] best interest is the same as mine."

Mother then testified about her activities with J.Z., including participation in swimming, art and gymnastics on Mondays, Wednesdays and Fridays at the YMCA, trips to Sesame Place and the zoo, and her use of "flashcards" with J.Z.

13

Mother stated that she had provided Father additional time with J.Z. on multiple occasions. She sought primary custody of J.Z., shared holidays and co-parenting counseling. She also testified that her mother assists in providing daycare and babysitting for J.Z.

At the conclusion of this hearing, we issued our Custody order which awarded primary physical custody of J.Z. to Mother and partial custody to Father on the first, third and fifth weekends as they occur from Friday at 6 p.m. until Sunday at 6 p.m. Father was also provided custody of J.Z. on Presidents Day, Columbus Day and Veterans Day, which occur on Monday, and on Independence Day, Labor Day, Halloween Eve, and Thanksgiving Day and Christmas Day in odd-numbered years.

Each party was also to enjoy, with 30 days' notice to the other party, two (2) nonconsecutive weeks of vacation. The parties were further directed to choose a co-parent counselor and attend and share the costs of a minimum of six co-parenting sessions. Mother was also directed to notify Father that she has affirmatively named Father as the first contact for all medical providers, and to place Father's name upon the child's birth certificate.

We also denied Father's Petition for a Name Change. While Father was insistent that the child's surname should either be his or at least hyphenated, we observed that the law was not settled with regard to this issue, and that an unmarried woman has the right to choose the name of the child. As Father had left Mother prior to the birth of J.Z. and the child had therefore been born out of wedlock, it was Mother's prerogative to choose J.Z.'s surname.

On July 7, 2015, Father filed his Notice of Appeal and his Concise Statement of Errors Complained of on Appeal. In his Statement, he complains of the following *verbatim*:

14

1. Whether the lower Court abused its discretion or committed an error of law when it awarded ＭＯＴＨＥＲ primary physical custody based upon unreasonable conclusions in light of the trial Court's sustainable findings of fact.

2. The lower Court's award of primary physical custody to ＭＯＴＨＥＲ was not supported by the evidence presented under the custody factors enumerated in 23 Pa.C.S. § 5328(a), the majority of which weighed in favor of Appellant/Father, and was thus unreasonable in light of the lower Court's sustainable findings.

3. Whether the lower Court's Order awarding primary physical custody to ＭＯＴＨＥＲ was unreasonable in light of the evidence presented on the record and the circumstances of this case because, when considering the best interests of the child, the lower Court failed to give appropriate weight to ＭＯＴＨＥＲ's ongoing attempts to deprive the minor child of Father's care and affection, which is problematic in light of the lower Court's simultaneous conclusion that ＭＯＴＨＥＲ lied to authorities and medical providers about Father, and has not and will not further the child's relationship with father.

4. Whether the trial court committed an abuse of discretion in awarding ＭＯＴＨＥＲ primary physical custody of the parties' minor child, when such award was against the weight of the evidence presented at trial, and is contrary to the best interests of the child.

5. Whether the lower Court erred when it failed to make a finding of shared legal custody based upon its sustainable findings and the evidence presented.

6. Whether the lower Court abused its discretion or committed an error of law in finding that it was not in the best interest of the minor child to change the child's name to include Father's surname, in light of the Court's sustainable findings.

Concise Statement of Errors Complained of on Appeal, July 7, 2015.

As previously noted, because this appeal has been designated as a "Children's Fast Track Appeal," pursuant to Pa.R.A.P. 1925(a)(2)(ii) this Court is required, within 30 days of receipt of the Notice of Appeal and Concise Statement of Errors Complained of on Appeal, to file a brief Opinion of the reasons for our Order. As noted, this Court has relied upon its own notes and recollection of the testimony produced at the hearings to explain the reasons for our decision.

15

The combined essence of five of Father's six (6) issues complained of on appeal is an assertion that upon consideration of the sixteen (16) statutory factors enumerated under 23 Pa.C.S. § 5328(a), the evidence at trial weighed in favor of granting Father primary physical custody of J.Z., and therefore this Court abused its discretion in awarding Mother primary physical custody.

The Superior Court of Pennsylvania has stated that:

[o]ur standard of review is as follows:
In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion.... Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*M.O. v. J.T.R.*, 85 A.3d 1058, 1061 (Pa.Super. 2014) (*citing V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa.Super. 2012).

It is well-established, pursuant to the provisions of the child custody statute, that "[u]pon petition, a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S.A. § 5338. Section 5328 of the child custody statute, which "establishes what the court shall consider in determining a child's best interest for purposes of making an award of custody," *M.O. v. J.T.R.*, 85 A.3d at 1062, provides as follows:

23 Pa.C.S.A. § 5328. Factors to consider when awarding custody

(a) Factors.--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
***

(3) The parental duties performed by each party on behalf of the child.

16

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

(b) Gender neutral.—In making a determination under subsection (a), no party shall receive preference based upon gender in any award granted under this chapter.

A review of the above-enumerated factors reveals that Father's contention that he should have been awarded primary physical custody is based upon only a few of the factors, including which party is more likely to encourage and permit frequent and continuing contact between the child and the other parent, and a consideration of whether there is a continued risk of harm to the child, and which party can better provide adequate physical safeguards and supervision of the child. While we found Father's desire to nurture and care for his child commendable, our weighted evaluation of all of the relevant factors led this Court to conclude that it was in J.Z.'s best interests to direct that Father immediately receive increased partial custody of his son while primary custody was to remain with Mother.

Father presented credible evidence to support his claims that Mother had withheld custody of J.Z. pursuant to the original Custody Order that had been entered on June 11, 2013. The evidence presented at the first two (2) hearings compelled this Court to conclude that Mother had impermissibly interfered with Father's custodial time, and as a result we entered an Interim Order awarding Father partial custody of J.Z. on Saturday and Sunday from 10:00 a.m. to 7:00 p.m. in order to immediately increase his participation in J.Z.'s life and development. It was evident, however, that as these hearings progressed, Mother realized that it was important for Father to become an integral part of J.Z.'s life, as Father's partial custody of J.Z. was increasing.

We also considered the evidence in which Father alleged that Mother's residence was an unsafe environment and posed a continuing risk of harm to J.Z. We determined, however, that while Father's allegations concerning J.Z.'s alleged head injuries were disconcerting and worthy of consideration, they were not completely credible, and we were not persuaded that Mother's residence posed an unreasonable continuing risk of harm. We also noted that throughout the course of these hearings, both parties continually complained about "unsafe" conditions at each other's homes and that the parties were permitted by this Court to conduct professional home inspections of each other's residences.

Some of the factors, such as the child's expressed preferences, and the child's sibling relationship were clearly not relevant in this case.

A careful consideration of the remaining factors convinced us that, while both parents could provide a loving and nurturing environment for the child, and both parties are more than capable of attending to the daily physical, emotional and developmental needs of J.Z., his best interests would be served by retaining primary custody with Mother while simultaneously greatly increasing Father's partial custody.

Mother has been vindictive and mean-spirited towards Father, and her animosity towards him for failing to marry her is palpable, however, Mother has also been a dutiful and caring mother, and she has had the primary responsibility for J.Z.'s care. While Father has stated his desire to assume those responsibilities, he is employed full-time which would necessitate his use of daycare services.

Mother, on the other hand, has provided, along with her mother, full-time care for J.Z., and we determined that it would be preferable for J.Z.'s well-being to maintain that situation rather than uproot him and have him sent to a completely new and unfamiliar daycare environment. J.Z.'s safety, health and welfare were clearly not at risk, and a change in primary custody would not serve to further the stability and continuity in the child's education, family life and community life.

We found no abuse committed by either party. Both parents indicated that they had extended family in the region. Mother's mother, however, has been involved in the care of J.Z. and is apparently readily available to assist in providing continuing child care when needed. Both parties alleged the presence of drug or alcohol consumption by members of the other party's household, however, the testimony did not convince us that J.Z. would be exposed to any immediate and greater danger or harm in one household as compared with the other.

Finally, in considering the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another, and the attempts of one parent to turn the child against the other parent, we observed that, while Mother had clearly behaved detrimentally and resisted shared custody in the past, Father was also extremely rigid and inflexible in his approach to co-parenting. For example, when Mother expressed concern over the child's exposure and susceptibility to certain illnesses as a result of his lowered immune system during a custody transfer, Father responded that "[J.Z.'s] best interest is the same as mine."

Both parties demonstrated a penchant for selfishly placing their own concerns above those of the child, and at times allowed their personal animosity toward each other to be contrary to J.Z.'s best interests.

As a consequence, we determined that a significant change in J.Z.' primary custody was not warranted by the circumstances and would not be in his best interests. We also concluded, however, that Father should have an important and pervasive presence in the child's life, and fashioned the custody Order accordingly.

Father has also alleged that this Court erred in denying his Petition for a Name Change.

> 28 Pa. Code § 1.6, Registration of the child of an unmarried woman, states:
>
> The child of an unmarried woman may be registered with any surname requested by the mother. If no other surname is so requested, the child shall be registered with the mother's surname.

28 Pa. Code § 1.6.

It has been established, however, that if a disagreement over the child's name exists, the best interests of the child standard applies, not 28 Pa. Code § 1.6, because that statute impermissibly distinguishes between unwed mothers and unwed fathers in violation of the

20

Equal Rights Amendment, Article 1, § 28, to the Pennsylvania Constitution. *In re Mull*, 18 D. & C.3d 290, 294 (C.P. Berks 1981).

The Superior Court of Pennsylvania subsequently stated that "[t]he child's best interests unquestionably must control [the trial court's discretion] in a proceeding to change a minor's surname." *In re C.R.C.*, 819 A.2d 558, 560-61 (Pa.Super. 2003) (*citing In Re: Schidlmeier*, 496 A.2d 1249, 1253 (Pa.Super. 1985).

> ... Further, the party petitioning for the minor child's change of name has the burden of coming forward with evidence that the name change requested would be in the child's best interest, and that where a petition to change a child's name is contested, the court must carefully evaluate all of the relevant factual circumstances to determine if the petitioning parent has established that the change is in the child's best interest. *See In Re: Montenegro*, 365 Pa.Super. 98, 528 A.2d 1381, 1382-1383 (1987) (*citing Schidlmeier*, 496 A.2d at 1253). In that evaluation, neither parent is to be accorded a presumption. *Id.*, 528 A.2d at 1382-1383.

> Our Supreme Court adopted the "best interests of the child" standard of review in appeals from the grant of a petition for change of name of a minor child by a non-custodial parent in *In Re: Grimes*, 530 Pa. 388, 609 A.2d 158 (1992). In *Grimes*, our Supreme Court noted:

>> Specific guidelines [for a child's best interests] are difficult to establish, for the circumstances in each case will be unique, as each child has individual physical, intellectual, moral, social and spiritual needs. **However, general considerations should include the natural bonds between parent and child, the social stigma or respect afforded a particular name within the community, and, where the child is of sufficient age, whether the child intellectually and rationally understands the significance of changing his or her name.**

> *Grimes*, at 394, 609 A.2d at 161 (citations and footnotes omitted) (emphasis added).

> We described the "best interest of the child standard" in *Sawko v. Sawko*, 425 Pa.Super. 450, 625 A.2d 692 (1993), as follows:

>> The "best interests [of the child]" standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-

21

being. On appeal, our scope of review is broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Sawko,* 625 A.2d at 693.

*In re C.R.C.,* 819 A.2d at 560-61.

*In re C.R.C.* is remarkably similar to the case at hand. There, the Court held that the mother's interference with the father's relationship with the child, who had been born out of wedlock, was not sufficient "by itself to render the trial court's grant of Father's petition proper." The Court held that "because the trial court found the bonds between Father and [the child] had not yet formed because of Mother's interference in their relationship," it was "impossible for Father to show that a bond existed between he and [the child] such that it would be proper for the trial court to change [the child's] surname to Father's surname." *Id.* at 562. The Court also cited *Schidlmeier,* which had previously held that a "trial court's rationale that the tradition and custom of patrilineal naming did not provide a sufficient rationale to sustain a conclusion that the name change was in [the child's] best interests," *Id.,* and concluded that

> we are unclear how a change in [the child's] surname would serve to foster a bond between Father and [the child]. Father cannot argue Mother would provide access to [the child] as a result of the name change, nor does Father present evidence that his name is held in higher esteem in the community. If it is Father's intention to forge a strong and nurturing relationship with [the child], Father is able to seek legal redress for visitation and custodial rights. We are unwilling to find that [the child's] name alone will provide a basis for a relationship with Father, nor are we willing to accept the trial court's speculative conclusion that [the child's] relationship with his Father, when developed, will suffer as a result of their different surnames. Accordingly, after a thorough review of the facts, we are constrained to conclude that the trial court abused its discretion when it found in favor of Father. Therefore, its order granting Father's petition is without support and may not stand.

22

*Id.* at 562-563.

In the instant matter, we addressed the "name change" issue in our Order of June 8, 2015, when we stated the following:

> The name change. The law is certainly not settled with regard to that issue. Usually an unmarried woman has the right to choose the name of the child. Any surname requested by the mother is the surname for the child. And the law presumes that the child shall be, as they say, registered with that name. Father says there's a disagreement. His name should either be M. or hyphenated. I don't see that as critical. This child was born out of wedlock. He is, J.Z. ———. I don't believe it's in his best interests to change his name. If Mother wishes to hyphenate the name, that's fine, but we won't compel her to do so.

Order, June 8, 2015, pp. 39-40.

Father, who has the burden of providing evidence that the name change requested would be in the child's best interest, presented no evidence that his request to change J.Z.'s surname to his was in the child's best interests, and we therefore denied his Petition.

BY THE COURT:

DATE:

ALAN M. RUBENSTEIN, J.

23